**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| FURMINATOR, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:06-CV-23 CAS |
| | ) | |
| ONTEL PRODUCTS CORP., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**REDACTED, NONCONFIDENTIAL VERSION OF
FINDINGS OF FACT AND CONCLUSIONS OF LAW
PREVIOUSLY ISSUED MARCH 17, 2006**

This matter is before the Court on plaintiff FURminator, Inc.'s Motion for Preliminary

Injunction on its claims of patent and trademark infringement.  The defendants are Ontel Products

Corporation, Linens 'N Things, Inc. (collectively referred to as "Ontel"),[1] Bamboo, a division of

Munchkin, Inc., and Munchkin, Inc. (collectively referred to as "Munchkin"). The Court

conducted an evidentiary hearing on February 14, 2006 and thereafter the parties submitted

proposed findings of fact and conclusions of law.  For the following reasons, the Court finds that

plaintiff's motion for preliminary injunction should be denied in all respects.

---

[1]Defendant Linens 'N Things offers for sale in this judicial district the alleged infringing
product manufactured by defendant Ontel Products Corporation.  These defendants assert a joint
defense.

# FINDINGS OF FACT

## A.    FURminator's Patent Infringement Claim

### *The Porter Patent*

1.      Plaintiff FURminator, Inc. ("FURminator") is the listed assignee and owner of U.S. Patent No. 6,782,846 B1 ("the Porter Patent").  *See* Def. Munchkin Ex. A, Porter Patent, cover page.

2.      The Porter Patent is titled "PET GROOMING TOOL AND METHOD FOR REMOVING LOOSE HAIR FROM A FURRY PET" and lists David and Angela Porter as the named inventors.  *See id.*

3.      The application for the Porter Patent was filed on May 30, 2000, and the Porter Patent issued on August 31, 2004.  *See id.*

4.      The invention disclosed and claimed in the Porter Patent involves putting a handle on a conventional clipper blade to perform a process known as "carding" or "deshedding."  This process is described in column 1, lines 19-29 of the Porter Patent, which states:

> Some pet groomers have determined that a toothed blade removed from electric grooming sheers [*sic*] is effective for removing shed hair from a dog or cat. The toothed blade includes a relatively sharp blade edge with a plurality of relatively short, comb-like teeth extending from the edge.  Although effective in removing shed hair, the size and shape of the toothed blade makes it difficult to hold while combing or passing the blade over the pet's fur.  This difficulty fatigues a groomer's hands and arms, thereby limiting the time a groomer can groom pets in this manner.

*See also id.*, Col. 2, ll. 41-54; Def. Munchkin Ex. C, Declaration of Paul Bryant, ¶¶ 3-4; Def. Munchkin Ex. D, Declaration of C.J. McLaughlin, ¶ 3.  The Porter Patent added an elongate handle to the toothed blade of the prior art to alleviate the fatigue problem.  *See* Def. Munchkin Ex. A, Porter Patent, Col. 1, ll. 32-47, 56-61.

5.      The grooming tool disclosed in the patent has an elongate handle portion 22 that extends generally along a handle axis X.  *See* Def. Munchkin Ex. A, Porter Patent, Figure 1.  A pet engageable portion 24 (described in the patent as an Oster A5 clipper blade) is secured to the handle portion.  The pet engageable portion 24 (shown in Figure 4) includes a blade portion 30 and a plurality of teeth 32.  The blade portion 30 includes a blade edge 34 with a number of different segments.  The teeth 32 extend from the blade edge 34.  *See* Def. Munchkin Ex. A, Porter Patent, Col. 2, ll. 25-47.

6.      To remove loose hair from a pet, a user places the pet engageable portion 24 in engagement with the pet so that the teeth 32 are against the pet's coat in a manner so that the first planar surface 36 is generally perpendicular to the handle axis X (*id.*, Col. 2, ll.s 55-58) and to the region of the pet's coat engaged by the teeth 32.  *Id.*, Col. 3, ll. 36-41.  The user then pulls the handle portion 22 generally along the handle axis X while maintaining engagement of the teeth 32 with the pet's coat.  *Id.*

7.      FURminator promotes and sells, among other things, three deshedding products entitled "FURminator® small professional deShedding tool," "FURminator® medium professional deShedding tool" and "FURminator® large professional deShedding tool" (collectively, the FURminator tools).  *See* Def. Ontel Ex. N (FURminator tool); Def. Munchkin Ex. L-N (FURminator tools); Def. Munchkin Ex. F, ¶ 9 (Porter Declaration); Joint Stipulation of Uncontested Facts, ¶ 2; D. Porter Dep. at 89:8-90:7.

8.      All three FURminator tools have the same basic configuration—a fine-toothed metal comb or "blade" and an elongated handle attached at the centerline of the blade and perpendicular to it, like a small rake or hoe.  The user places the blade against the pet's coat and

then pulls the handle in a direction generally <u>parallel</u> to the longest dimension of the handle, which drags the blade through the fur so that the blade's teeth engage and remove the loose hair, like pulling a rake through a lawn covered with leaves. FURminator's instructions and infomercial show its tools being used in this manner. *See* Def. Ontel Ex. N (FURminator tool); Def. Ontel Ex. O (FURminator infomercial); Def. Munchkin Ex. L (FURminator tool); Def. Munchkin Ex. M (FURminator tool); Def. Munchkin Ex. N (FURminator tool); Plaintiff Ex. 40 (FURminator instructions).

9.     FURminator sells its tools through two primary channels of distribution—first, by direct sales to professional dog groomers and other pet professionals such as breeders and veterinarians and second, through the QVC television shopping channel. Beginning in the fall of 2005, FURminator also briefly sold its tools through a television infomercial, but discontinued the infomercial in mid-December 2005. FURminator also sells its tools at PetSmart, a national pet specialty retail chain. FURminator's tools carry a retail price between $29.95 and $49.95. *See* Def. Ontel Ex. S (Hawthorn Direct Broadcast History); Def. Ontel Ex. T (chart of FURminator's ads and sales); Def. Munchkin Ex. F , ¶¶10-12 (Porter Decl.); D. Porter Dep. at 17:16-18:25; 20:12-15; 21:5-22; 23:11-15; 26:2-9; 31:6-12; 32:17-34:22; 178:10-179:1; 168:10-18; A. Porter Dep. at 163:1-166:14.

### The Accused Munchkin Product

10.     Munchkin sells Munchkin's Bamboo® Dog de-shedding comb and Munchkin's Bamboo® Cat de-shedding comb, which are substantially identical in their configuration, differing only in size. *See* Def. Munchkin Exs. AA, EE, AAA, & NNN. Each includes a metal blade with an integrated comb. A padded grip portion is provided that is generally coplanar (along the same

plane) with the plane in which the metal blade resides. *See id.*; *see also* Pl.'s Ex. 43, Bamboo de-shedding tool instruction manual.

11.    The Munchkin products are used by holding the grip portion while passing the comb and blade over a pet's fur. *See* Pl.'s Ex. 43. The orientation of the groomer's hand and the motion of the tool while using the Munchkin products are substantially identical to those of the groomers practicing the admitted prior art "carding" process that is described in column 1, lines 19-28 of the Porter Patent. *See id.*

12.    The Munchkin products do not have an elongate handle. *See* Def. Munchkin Exs. AA, EE, AAA, & NNN; McLaughlin Dep., Vol. I at 47:2 - 49:9; *id.*, Vol. II at 86:15-24, Feb. 9, 2006; Preliminary Injunction Hearing Transcript ("Hearing Tr.") at 122:20 - 123:3, Feb. 14, 2006. To use the Munchkin products, a user would not pull the grooming tool along anything that could be described as an elongate handle axis. *See* Pl.'s Ex. 43; McLaughlin Dep., Vol. I at 47:2 - 49:9.

13.    Munchkin was aware of the Porter Patent and specifically designed its product to avoid infringement of the Porter Patent, even eliminating from the final product a handle that was on a prototype to ensure non-infringement of the Porter Patent. *See* Def. Munchkin Ex. E, Declaration of Mark Hatherill, ¶¶ 12-14 (including referenced exhibits); Hatherill Dep. at 120:17 - 121:8, Feb. 10, 2006. Munchkin made significant investment in such development of its accused products. *See* Def. Munchkin Ex. E, Hatherill Decl., ¶ 15.

14.    Munchkin asserts it has sufficient assets to pay monetary damages for any alleged infringement by its accused products. *See id.*, ¶ 18.

### *The Accused Ontel Product*

15.     Ontel promotes and sells, among other things, a carding or deshedding tool called the "Shed Ender™ Professional De-Shedding Tool" (the "Shed Ender").  *See* Def. Ontel Ex. A, ¶¶ 22-24 (Murphy Decl.); Def. Ontel Ex. G, ¶¶ 17, 20 (Anderson Decl.); Def. Ontel Ex. K, ¶ 23 (Khubani Decl.); Def. Ontel Ex. M (Shed Ender product).

16.     The Shed Ender consists of a fine-toothed metal comb or "blade" and an elongated handle, but the handle is located at the end of the blade and parallel to it, like a knife or a comb with a handle.  *See* Def. Ontel Ex. A, ¶¶ 20 (Murphy Decl.); Def. Ontel Ex. G, ¶¶ 22 (Anderson Decl.); Murphy Dep. at 52:20-53:11; Def. Ontel Ex. M (Shed Ender product); Anderson Dep. at 56:4-15; Khubani Dep. at 46:12-17; 75:12-22.

17.     Unlike the FURminator tools, the Shed Ender is used by placing the blade against the coat of a furry pet like a dog or cat and then pulling the handle in a direction generally perpendicular to the longest dimension of the handle.  Ontel's instructions and infomercial show the Shed Ender being used in this manner, and in fact, pulling the Shed Ender's handle in a direction parallel to the longest dimension of the handle prevents the teeth of the metal comb from engaging the pet's fur and could injure the pet.  *See* Def. Ontel Ex. A, ¶¶ 20 (Murphy Decl.); Def. Ontel Ex. G, ¶¶ 22-25 (Anderson Decl.); Def. Ontel Ex. P (Ontel infomercial); Def. Ontel Ex. VV (Shed Ender instructions); Murphy Dep. at 52:20-53:11; Khubani Dep. at 86:4-20; 87:11-15.

18.     Ontel sells its product through retail stores such as Wal-Mart (mass retail), Walgreens and CVS (the top two mass drug retailers), Bed Bath & Beyond and Linens 'N Things (the top two specialty housewares retailers), and Doctor Leonard and Harriet Carter (the top two mass retail catalogs).  Ontel also sells its product through a television infomercial.  Ontel's product

sells for a retail price of $9.99 to $14.99. *See* Def. Ontel Ex. K, ¶¶ 16, 27 (Khubani Decl.); Def. Ontel Ex. III, page 2 (ONT 00605) (Ontel sales document); Khubani Dep. at 121:18-22.

### *Prior Art to the Porter Patent*

19.     Prior to the Porter Patent, groomers in the United States used toothed electric clipper blades and stripping knives to "card," "de-shed," or remove loose hair from animals without pulling hair that is not loose. *See* Def. Munchkin Ex. A, Porter Patent, Col. 1, ll. 19-29; Hearing Tr. at 120:11 - 122:3; McLaughlin Dep., Vol. I at 23:8 - 24:4; Def. Munchkin Ex. C, Bryant Decl., ¶¶ 3-8.

20.     Clipper blades with grips formed by masking tape were in public use in the United States more than one year prior to the filing date of the Porter Patent application. *See* Def. Munchkin Ex. C, Bryant Decl., ¶¶ 3-8.

21.     Stripping knives were in public use to perform carding more than one year before the filing date of the Porter Patent application. *See id.*, ¶¶ 5-6; Def. Munchkin Ex. D, McLaughlin Decl., ¶¶ 3-6; McLaughlin Dep., Vol. I at 23:8 - 24:4; Def. Ontel Ex. D (FURminator video labeled FURminator 001029); Def. Munchkin Exs. GG, HH, JJ, KK, LL, MM, NN, PP, ZZ, FFF, GGG, HHH, III, JJJ, and KKK. The Porters were aware that stripping knives could be used to perform carding. *See* Def. Ontel Ex. D (FURminator video).

22.     Angela Porter admitted that she knew stripping knives were on sale and were in public use in the United States more than one year before the filing date of the Porter Patent. *See* A. Porter Dep. at 49:6-9, Feb. 4, 2006.

23.     Stripping knives are available in a number of different shapes and sizes, but all share the same basic configuration—there is a fine-toothed metal comb or "blade" and an elongated

handle attached at the end of the blade and parallel to it, like a knife or a comb with a handle. Ontel's Shed Ender looks and works like a stripping knife. *See* Def. Ontel Ex. A, ¶¶ 14, 16, 17, 19-20 (Murphy Decl.); Def. Ontel Ex. D (Winter 1997 Pet Stylist magazine blurb regarding carding); Def. Ontel Ex. G, ¶¶ 12-26 (Anderson Decl.); Def. Ontel Ex. I (1996 - "Grooming the American Cocker Spaniel" videocassette); Anderson Dep. at 38:3-5; 47:3-12.

24.     When used for carding or deshedding, a stripping knife is used in exactly the same manner as the Shed Ender. The user places the blade against the fur and then pulls the handle in a direction generally <u>perpendicular</u> to the longest dimension of the handle. *See* Def. Ontel Ex. A, ¶¶ 17, 20 (Murphy Decl.); Def. Ontel Ex. C ("Captivating Cockers" DVD); Def. Ontel Ex. D (Winter 1997 Pet Stylist Magazine); Def. Ontel Ex. G, ¶¶ 12-19, 22-25 (Anderson Decl.); Def. Ontel Ex. P (Shed Ender infomercial); Murphy Dep. at 52:20-53:11; Khubani Dep. at 87:11-15.

25.     Multiple prior art references disclose handles that are perpendicular to the working plane of the grooming tool. *See, e.g.*, Def. Munchkin Ex. BB (U.S. Patent No. 441,135 to Clements); Def. Munchkin Ex. J (U.S. Patent No. 797,184 to Deneen); Def. Munchkin Ex. B, Porter Patent File History, at 350-57 (citing Clements and Deneen references as anticipatory prior art).

### Disputed Claim Language and the Parties' Proposed Constructions

26.     Claim 1 of the Porter Patent reads as follows:

1. A method of removing loose hair from a furry pet such as a dog or cat having loose hair and non-loose hair, the method comprising:

providing a grooming tool having an elongate handle portion extending generally along a handle axis, and a pet engageable portion secured to the handle portion, the pet engageable portion including a blade portion and a plurality of teeth, the blade portion including a blade edge, the teeth extending from the blade edge;

placing the pet engageable portion in engagement with the pet;

pulling the handle portion generally along the handle axis while maintaining engagement of the pet engageable portion with the pet to cause the blade edge to engage the loose hair of the pet and pull it from the pet without cutting or pulling the non-loose hair from the pet.

Def. Munchkin Ex. A, Porter Patent, Col. 3, ll. 59 to Col. 4, line 7.

27.     The parties dispute the meaning of multiple claim terms and phrases appearing in claim 1 and the two other independent claims of the Porter Patent (claims 12 and 16), including the phrases "an elongate handle portion extending generally along a handle axis" and "pulling the handle portion generally along the handle axis."

28.     FURminator proposes that the phrase "an elongate handle portion extending generally along a handle axis" be construed as follows:  "a part designed to be held by a hand, and having more length than width, projecting generally along a reference line along which a handle extends (i.e., any of the following:  a longitudinal handle axis, a lateral handle axis, or a transverse handle axis)."  Joint Preliminary Claim Construction and Prehearing Statement at 3-5.

29.     Munchkin proposes that the phrase "an elongate handle portion extending generally along a handle axis" be construed as follows:  "a part [of the grooming tool] designed to be grasped by the hand, that is slender and long in proportion to its width, stretching out to its fullest length generally in the direction of a long axis of the handle."  *Id.* at 14-16.

30.     Ontel proposes that the phrase "an elongate handle portion extending generally along a handle axis" be construed as follows: "a grooming tool having a handle portion of more length than width that is stretched or spread out to greater or fullest length generally along a handle axis," with "handle axis" defined as "the axis defined by the longest dimension of the elongated handle."  *Id.* at 26; *see* Ontel's Proposed Findings of Fact and Conclusions of Law ¶ 49.

31.     FURminator proposes that the phrase "pulling the handle portion generally along the handle axis" be construed as follows: "the action of moving [the handle portion of] a comb or brush through hair mostly along the reference lines along which the handle extends." Joint Preliminary Claim Construction Statement at 3, 7-8.

32.     Munchkin proposes that the phrase "pulling the handle portion generally along the handle axis" be construed as follows:  "applying force to the handle portion so as to cause or tend to cause motion toward the source of the force generally in the direction of the long axis of the handle." *Id.* at 16-19.

33.     FURminator proposes that the third step of claim 1, "pulling the handle portion generally along the handle axis while maintaining engagement of the pet engageable portion with the pet to cause the blade edge to engage the loose hair of the pet and pull it from the pet without cutting or pulling the non-loose hair from the pet," include the additional limitation of "as quickly and as effectively as the toothed blades disclosed in the Porter Patent." *Id.* at 7-8.

34.     Munchkin proposes that the third step of claim 1 be construed as a step-plus-function element pursuant to 35 U.S.C. § 112, ¶ 6, wherein, to achieve the claimed function of engaging the loose hair of the pet and pulling it from the pet without cutting or pulling the non-loose hair from the pet, the entire disputed phrase include the following: "(1) pulling the handle portion of a grooming tool having a pet engageable portion constructed as described in the specification (col. 2, l. 41 - col. 3, l. 49) and prosecution of the Porter Patent (Munchkin Ex. B, at 447) generally in the direction of the elongate handle axis while maintaining engagement of the pet engageable portion with the pet so that a first planar surface of the pet engageable portion is generally perpendicular to the region of the pet's coat; and (2) pulling the handle portion to cause a

second planar surface of the pet engageable portion (that together with the first planar surface defines a blade edge) to trail the first planar surface." *Id.* at 20-22.

**B.** **FURminator's Trademark Infringement Claim**

*The Alleged Trademark "DESHEDDING"*

35.     FURminator claims to have used the word "deshedding" in connection with certain of its grooming products since 2003. *See* Def. Munchkin Ex. F, Declaration of David Porter, ¶ 8; Def. Ontel Ex. J, File History of "DESHEDDING" federal trademark application.

36.     On July 28, 2005, FURminator filed an intent-to-use trademark application for the word "DESHEDDING," for "non-medicated, non-veterinary grooming preparation, namely, deshedding hair conditioner for pets; brushes for pets; and dog treats." Def. Munchkin Ex. Q.

37.     On February 17, 2006, the United States Patent and Trademark Office ("USPTO") rejected plaintiff's application for a trademark on the proposed mark "DESHEDDING," concluding that the "proposed mark is merely descriptive of the identified goods," and that the "mark appears to be generic as applied to the goods and, therefore, incapable of functioning as a source-identifier for applicant's goods." Def. Munchkin Ex. OOO at 3. The PTO attached "evidence taken from the Internet show[ing] numerous different parties using the term 'DESHEDDING' as the common generic name for pet grooming items that remove the dead, loose hair undercoat of pets." *Id.* Some of the examples selected by the PTO were also submitted to the Court by Ontel as examples of the generic use of the term *deshedding*. The PTO identified Ontel's use of the word *deshedding* on its Shed Ender product as a generic use. Finally, the PTO noted that FURminator itself used the word to identify the goods for which it sought the mark. *Id.*

38.     The USPTO also denied plaintiff's request to amend the application to delete the term "deshedding" from the identification of products section of the application because the proposed amendment would "broaden the scope of the application to include pet hair conditioners that do not serve a deshedding purpose." *Id.* at 2.

39.     "Deshedding" is a word used in the pet grooming industry to describe the removal of loose hair from a pet's coat while leaving the non-loose hair intact. *See* Hearing Tr. at 118:18 - 119:11; Def. Ontel Ex. A, ¶¶ 13-26; Def. Ontel Ex. G, ¶¶ 12-13, 27-29. "Deshedding" is a combination of the prefix "de-", which means to remove or remove from, or to reduce, and the word "shedding." Def. Munchkin Ex. H, *The American Heritage Dictionary* 368 (2d Coll. ed. 1991).

40.     David Porter, Chief Executive Officer of FURminator, admitted he was aware of prior uses of the word "deshedding" by others, *see* D. Porter Dep. at 32:1 - 33:11, including by Barbara Bird of the Pet Health Transformation Center, who claims to have coined the word "deshedding" and has been using the term since the 1980's. Def. Munchkin Ex. DD. Other typical uses of the term "deshedding" by members of the pet grooming industry appear in Munchkin's Exhibits V, W, X, Y, and Z. Paul C. Bryant, one of Munchkin's experts, testified by declaration that the terms "deshed" and "deshedding" "are commonly used in the grooming field to describe removal of a dog's undercoat." Def. Munchkin Ex. C, Bryant Decl., ¶ 9; *see also* Def. Munchkin Ex. E, Hatherill Decl., ¶ 9 ("Munchkin considered the term ["deshedding"] to be a generic descriptive word for removing shedding hair from a pet at the time the Dog de-shedding comb and the Cat de-shedding comb were named."). Similarly, Joan Anderson, one of Ontel's experts,

testified that she had heard the word "deshedding" from customers at her grooming shop approximately three times a week for over twenty years. *See* Hearing Tr. at 119:14-25.

41.     Both professional groomers and consumers have used and continue to use the term "deshedding" to refer to this process, and the use of the term "deshedding" in this way appears in numerous magazines, printed advertisements, web sites, brochures and business cards, most of which predate the time in which FURminator claims to have established its exclusive right to the word "deshedding" as a trademark. Def. Ontel Ex. GG (D-shed); Def. Ontel Ex. R. p. 7 (FURminator 00955) (De-shed), pp. 9-10 (ONT 807-08) (Brushing and deshedding), pp. 13-16 (Hollywood Hounds) (Brushing, dematting & deshedding), pp. 17-18 (Nash Academy) (deshedding), pp. 19-23 (Canine Design School) (Brushing, dematting & deshedding); pp. 24-25 (TropiClean) (deshedding); p. 32 (K-9 Country Club) (deshedding system, deshedding tool); pp. 35-39 (Dog Club message board) (deshedding Jack Russells, deshedding products); p. 40 (ONT 00813 Grooms by Appointment) (deshedding, deshed).

42.     In various instances, FURminator also uses the term "deshedding" to indicate the type of tool being sold and not the brand name of its product. *See* Def. Ontel Ex. FF at p. 1 (FURminator 00874) (deshedding tool), p. 2 (FURminator 930) (deshedding tool), p. 3 (Deposition Ex. 4) (deshedding shampoo, deshedding solution, deshedding tool), pp. 4-5 (FURminator 00237-38) (deshedding conditioner), pp. 4-5 (FURminator 00237-38) (no use of deshedding, instead simply FURminator tool), p. 6 (FURminator 00395) (deshedding conditioner), p. 7 (FURminator 00424) (deshedding tool), p. 8 (FURminator 00425) (deshedding tool), pp. 9-11 (FURminator 00410-11, 414) (deshedding tool, "a tool that deSheds them"), pp. 12-14

(FURminator 01754) (deshedding tool, deshedding edge, deshedding shampoo, deshedding solution, deshedding dog treats), op. 15-16 (FURminator 1647) (deshedding tool).

### *FURminator's Sales and Advertising*

43.     While FURminator alleges that it began selling the product in 2003, there is no documentary evidence to support that assertion.  FURminator had approximately [$ redacted] in sales for 2004.  *See* Def. Munchkin Ex. U, at FURminator 1540.

44.     FURminator's marketing expenditures for 2004 were under [$ redacted], only a fraction of which was for advertising to the general consumer.  *See* Def. Munchkin Ex. U at FURminator 1543; D. Porter Dep. at 44:24 - 45:12; 46:22 - 48:20.

45.     FURminator spent approximately [$ redacted] on advertising in 2005.  Included in that amount were the costs of producing an infomercial.  *See* Def. Munchkin Ex. U at FURminator 1544;  D. Porter Dep. at 49:7 - 51:18.

46.     David Porter's Declaration states that FURminator "sells the DESHEDDING™ [sic] tool to the public . . . through retail outlets . . . and stores such as PetSmart, Wal-Mart, Target, Sam's, Costco, Linens 'N Things, and Bed Bath and Beyond."  Def. Munchkin Ex. F, Porter Decl., ¶ 14.  Mr. Porter subsequently testified that in fact no sales have been made to Wal-Mart, Target, Sam's, Costco, Linens 'N Things, and Bed Bath and Beyond.  D. Porter Dep. at 28:10 - 29:3.

### *Munchkin's Use of "DESHEDDING"*

47.     Munchkin uses the word "deshedding" on packaging for its deshedding grooming tools, to describe the function of these tools in removing loose hair from a pet's coat.  *See* Def. Munchkin Ex. E, Hatherill Decl., ¶ 8.

14

48.     Munchkin uses its BAMBOO trademark on all of its pet products, including its pet deshedding tools.  Def. Munchkin Ex. AA, EE, AAA, & NNN.

49.     The packaging for Munchkin's product is primarily red and white, and Munchkin's product itself is red and white.  The phrase "dog de-shedding comb" appears in relatively small letters underneath the more prominent BAMBOO trademark.  *See id.*

50.     In contrast, the product packaging for FURminator's deshedding tool is predominantly blue and yellow.  FURminator's FURMINATOR trademark and paw-shaped logo are featured prominently on the package.  *See* Def. Munchkin Exs. L, M, & N.

51.     The Munchkin and FURminator products have substantially different shapes.  *See* Def. Munchkin Exs. L & EE.

52.     There have been no instances of actual confusion between FURminator's product and Munchkin's product among members of the relevant purchasing public.  *See* Hearing Tr. at 146:23 - 147:13 (referring to D. Porter Dep. at 63:23 - 64:8 and A. Porter Dep. at 98:4-10).

53.     Munchkin's deshedding tools cost substantially less than FURminator's deshedding tools.  *See* Def. Munchkin Ex. F, D. Porter Decl., ¶¶ 10-12, 43.

54.     FURminator is not aware of any sales it has lost due to the Munchkin product.  *See* D. Porter Dep. at 63:23 - 64:8.

*Ontel's Use of "DESHEDDING"*

55.     FURminator's deshedding tools are packaged in a clear plastic clamshell package with a yellow background card.  The card features the words "FURminator®" at the top and "deShedding™ tool" along the left-hand side.  The background card does not feature any photographs—just the words "for the removal of undercoat and loose hair," "Guaranteed to

15

reduce shedding better than any brush or comb," and "4 in./10.16 cm [or other size] deShedding edge." *See* Def. Ontel Ex. N (FURminator tool in packaging); Def. Munchkin Ex. L (FURminator tool); Def. Munchkin Ex. M (FURminator tool); Def. Munchkin Ex. N (FURminator tool).

56.     Ontel's Shed Ender is packaged in a clear plastic clamshell package with a blue background card, a quarter-height, blue front card and the product held between the two cards in a clear plastic blister. The background card features the words "Shed Ender™" in the largest type at the top of the card with the words "Professional De-Shedding Tool" in smaller type beneath it. As recognized by the PTO, Ontel does not use the term "deshedding" to indicate the Shed Ender's source or origin, but rather to identify the type of product being sold. The front and background cards also feature three circular photographs illustrating the use of the Shed Ender on a pet and a dog and cat behind a pile of loose hair removed using the Shed Ender product. *See* Def. Ontel Ex. M (Shed Ender product in packaging); Def. Ontel Ex. K, ¶ 23 (Khubani Decl.); Def. Ontel Ex. M (Shed Ender product); Def. Munchkin Ex. OOO (PTO registration refusal); Khubani Dep. at 95:4-10.

57.     The FURminator deshedding tools and Ontel's Shed Ender are in large part not sold through the same channels of distribution. FURminator's tools are sold directly to professional dog groomers and other pet professionals and to consumers through the television shopping channel QVC and at national pet speciality retailer PetSmart. Ontel's Shed Ender is sold through national retail chains such as Wal-Mart, Walgreens, CVS, Bed Bath & Beyond and Linens 'N Things and catalog retailers such as Doctor Leonard and Harriet Carter. *See* Def. Ontel Ex. K, ¶¶ 27, 46 (Khubani Decl.); D. Porter Dep. at 20:12-25; 21:5-22; 23:11-15; 26:2-9; 31:6-12; 32:17-34:22; 178:10-179:1; Hearing tr. at 148:18-149:13; Khubani Dep. at 43:5-11; 68:9-12.

58.     Ontel also sells the Shed Ender through a television infomercial.  FURminator briefly test marketed its product through an infomercial and stopped doing so in December 2005, before this litigation was filed.  Even if FURminator were still running its infomercial, there are a number of prominent differences between the two companies' infomercials.  For example, the Shed Ender spot displays the Shed Ender trademark throughout the entire commercial, but the FURminator displays no trademark.  The Shed Ender spot contains expensive animation, but FURminator has no animation.  The FURminator has testimonials but Shed Ender has none.  The price points for the products are significantly different.  In addition, the bonus gifts offered are different.  *See* Def. Ontel Ex. S (Hawthorne Direct broadcast history); Def. Ontel Ex. T (chart of FURminator's ads and sales); Hearing tr. at 152:16-19; Def. Ontel Ex. K, ¶¶ 22, 46 (Khubani Decl.); Def. Ontel Ex. L, ¶ 6 (Eichen Decl.); Def. Ontel Ex. O (FURminator infomercial); Def. Ontel Ex. P (Ontel infomercial).

59.     Ontel knew of FURminator's deshedding tool and intended to make a competing product.  There is no evidence, however, of any bad faith attempt by Ontel to pass off its goods as those of FURminator.  Def. Ontel Ex. K, ¶¶ 13-24; Khubani Dep. at 43:12-44:9; 53:11-17; 81:17-82:2; 85:25-86:20; 95:4-10.

60.     FURminator has not conducted any form of consumer survey or study to determine whether there is any measurable level of confusion caused by Ontel's product in the marketplace, although FURminator has known of Ontel's competing product since as early as September 2005. D. Porter Dep. at 41:6-11.

61.     There is no evidence of actual confusion here.  When Ontel started selling its competing product, several people with a close connection to FURminator (such as employees or

personal acquaintances of David or Angela Porter) informed the Porters that they had seen Ontel's product advertised on television. D. Porter Dep. at 187:19-190:1; A. Porter Dep. at 180:10-182:16; 198:25-211:12. By bringing this information directly to the Porters, it is clear that these people understood that they were seeing Ontel's product, not FURminator's, on television and even appreciated that FURminator would want to know about television advertising being run by a competitor. This is the antithesis of consumer confusion.

62.     Ontel's Shed Ender currently represents approximately twenty percent (20%) of the company's sales. Without the ability to continue selling, Ontel would lose immediately a significant portion of its revenue overnight. Def. Ontel Ex. K, ¶ 31 (Khubani Decl.); Khubani Dep. at 111:1-10.

63.     If an injunction were issued, Ontel's retailers are likely to sell the Shed Ender at greatly reduced close-out pricing (charged back to Ontel) or pull the product from store shelves and catalogs and would refuse to assign any more space to the product, as there would be no way for Ontel to fill future orders. The loss of this product would also represent a significant blow to Ontel's reputation with all of its most important customers, as these customers make a significant investment in carrying each Ontel product. Def. Ontel Ex. K, ¶¶ 32-40 (Khubani Decl.); Khubani Dep. at 109:2-11.

64.     Ontel has never had any product subject to an injunction or pulled from retailer's shelves, and so any injunction would take Ontel's retailers and other customers by surprise, disrupt their business relationships, harm their trust in Ontel as a supplier, and create considerable ill will and negative publicity for Ontel. Def. Ontel Ex. K, ¶ 40 (Khubani Decl.); Khubani Dep. at 109:2-11.

# CONCLUSIONS OF LAW

## A.   FURminator's Patent Infringement Claim

### *Preliminary Injunction Standards*

1.    Federal Circuit law controls the issuance of an injunction against alleged patent infringement under 35 U.S.C. § 283.  *See Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988).

2.    In a patent infringement case, the decision whether to issue a preliminary injunction is within the court's discretion.  *See Amazon.com, Inc. v. BarnesandNoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).  "A preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted."  *National Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1324 (Fed. Cir. 2004) (internal quotations omitted).

3.    In deciding whether to grant or deny a plaintiff's motion for preliminary injunction, the court considers (1) whether plaintiff has demonstrated a reasonable likelihood of success on the merits; (2) whether plaintiff will suffer irreparable harm if an injunction is not granted; (3) whether the balance of hardships favors the grant of injunctive relief; and (4) whether and to what extent granting the injunction would have a positive impact on the public interest.  *See Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1338-39 (Fed. Cir. 2003).

4.    A court cannot grant a preliminary injunction unless a plaintiff establishes both a reasonable likelihood of success on the merits and the threat of irreparable harm.  *See Anton/Bauer, Inc. v. PAG, Ltd.*, 329 F.3d 1343, 1348 (Fed. Cir. 2003); *Sofamor Danek Group, Inc. v. DuPuy-MoTech, Inc.*, 74 F.3d 1216, 1223 (Fed. Cir. 1996).

5.     To demonstrate a likelihood of success on the merits, a plaintiff must show that (1) it will likely prove infringement of one or more of the patent claims at trial; and (2) any challenges to the validity of the patent lack substantial merit. *See Amazon.com*, 239 F.3d at 1351; *Anton/Bauer*, 329 F.3d at 1348.

6.     Irreparable harm is presumed in a patent case *only* where a patent owner "establishes a strong showing of likely infringement of a valid and enforceable patent." *Pfizer, Inc. v. Teva Pharmaceuticals USA, Inc.*, 429 F.3d 1364, 1381 (Fed. Cir. 2005).

### The Law of Claim Construction

7.     The first step in any infringement analysis involves construing the patent to determine the scope of its asserted claims. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Claim construction is a matter of law reserved exclusively for the court. *See Markman*, 517 U.S. at 387. A court need not definitively construe the claims at the preliminary injunction stage, but must preliminarily construe the claim in order to determine whether the accused product infringes. *See Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1363 (Fed. Cir. 2001).

8.     As the Federal Circuit recently articulated in its landmark decision in *Phillips v. AWH*, to determine the correct claim construction, a court must follow, first and foremost, the words of the patent claim itself. It is a bedrock principle of patent law that the claims define the invention that the patentee owns, and the court may neither add words to nor subtract words from the claims in the process of construing them. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc); *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1373 (Fed. Cir. 2002) (citing *Perkin-Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1533 (Fed. Cir. 1987)).

9.     Claim terms "are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." *Id.* at 1313.

10.     "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*; *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum.  Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history.").

11.     "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314.  "In some cases, the ordinary meaning of claim language as readily understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.*

12.     The claims must, however, "be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979.  The specification "is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582.

13.     In addition to consulting the specification, the court "should also consider the patent's prosecution history, if it is in evidence." *Markman*, 52 F.3d at 980.  "The prosecution history, which we have designated as part of the 'intrinsic evidence,' consists of the complete

record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent. . . . Furthermore, like the specification, the prosecution history was created by the patentee in attempting to explain and obtain the patent." *Id.*

14.     Courts may also rely on extrinsic evidence in construing claims. Extrinsic evidence is "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980.

15.     "Within the class of extrinsic evidence, the court has observed that dictionaries and treatises can be useful in claim construction." *Phillips*, 415 F.3d at 1318. "Because dictionaries, and especially technical dictionaries, endeavor to collect the accepted meanings of terms used in various fields of science and technology, those resources have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention." *Id.*

16.     Similarly, expert testimony "can be useful to a court for a variety of purposes, such as to provide the background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.*

### *The Court's Preliminary Claim Construction*

17.     In this case, the key term requiring construction is **handle axis**, which appears in two longer clauses in claim 1 of the patent—"*a grooming tool having an elongate handle portion*

*extending generally along a **handle axis***" and "*pulling the handle portion generally along the*

***handle axis.***" Def. Ontel Ex. HH ('846 patent) (col. 3, ll. 62-63; col. 4, l. 3).

<u>**"an elongate handle extending generally along a handle axis"**</u>

18.     The first step of method claim 1 of the Porter Patent requires providing a grooming

tool having "an elongate handle portion extending generally along a handle axis." Def. Munchkin Ex.

A, Porter Patent, Col. 3, ll. 62-63.

19.     As an initial matter, the Court notes that in the first clause, the term ***handle axis*** is

preceded by the indefinite article "a" while the second clause uses the definite article "the." This

use of indefinite and definite articles in a patent claim indicates simply that ***the handle axis*** referred

to in the second clause is the same thing as ***a handle axis*** referred to in the first clause, according

to a universally recognized requirement for precise language in the drafting of patent claims. Def.

Ontel Ex. HH ('846 patent) (Claim 1); Manual of Patent Examining Procedure, § 2173.05(e);

*MercExchange, LLC v. eBay, Inc.*, 401 F.3d 1323, 1338 (Fed. Cir. 2005); *North Am. Vaccine,*

*Inc. v. American Cyanamid Co.*, 7 F.3d 1571, 1575-76 (Fed. Cir. 1993) (citing Robert C. Faber,

*Landis on Mechanics of Patent Claim Drafting* 351 (3d ed. 1990)); *Baldwin Graphic Sys., Inc. v.*

*Siebert, Inc.*, 2005 U.S. Dist. LEXIS 15527, at *10-15 (N.D. Ill. July 28, 2005) (citing MPEP §

2173.05(e)).

20.     A "handle portion" for the aforementioned grooming tool would commonly be

understood to one of ordinary skill in the art as <u>the part of the grooming tool designed to be</u>

<u>grasped by the hand</u>. This meaning is consistent with the written description and drawing of the

handle in the patent. *See* Def. Munchkin Ex. A, Porter Patent Figure 1; Col. 2, ll. 24-40. The

specification also describes the "handle portion" consistently with the common dictionary definition

of the term, which defines "handle" as "a part of a thing made specifically to be grasped or held by the hand."  Def. Munchkin Ex. LLL, *Random House College Dictionary* 599 (Rev. ed. 1984).

21.    The definition of the term **handle axis** is found in the language of the first clause—specifically, in the use of the words "elongate" and "extending" in "*a grooming tool having an elongate handle portion extending generally along a **handle axis***."  Def. Ontel Ex. HH ('846 patent) (col. 3, ll. 62-63); *Phillips*, 415 F.3d at 1313-14 (cannot look at claim terms in a vacuum; the context in which a term is used in the asserted claim can be highly instructive).

22.    The ordinary, plain language meaning of the word "elongate" is "having more length than width."  Def. Ontel Ex. W (dictionary); *Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.  . . .  In such circumstances, general purpose dictionaries may be helpful.") (citation omitted).

23.    The ordinary, plain language meaning of the word "extending" is "stretching or spreading out (something) to greater or fullest length."  Def. Ontel Ex. W (dictionary); Def. Ontel Ex. HH ('846 patent) (col. 2, ll. 32-34 and figs. 1-2); Def. Munchkin Ex. G (dictionary); Joint Claim Construction Statement at 14-16, 23; *Phillips*, 415 F.3d at 1314.

24.    There are no special definitions of the terms "elongate" or "extending" shown in either the specification or prosecution history of the '846 patent.  Def. Ontel Ex. HH ('846 patent); Def. Munchkin Ex. B (prosecution history of '846 patent); Joint Claim Construction Statement at 14-15, 23.

25. Incorporating the plain language definitions of "elongate" and "extending" into the original patent claim, the clause becomes "a grooming tool having a handle portion <u>of greater length than width</u> that is <u>stretched or spread out to greater or fullest length</u> generally along a handle axis." In other words, the clause defines the ***handle axis*** as the one specific axis that corresponds to the longest dimension of the elongate handle.

26. Support for this construction of the term ***handle axis*** is found in the specification itself, where the inventors make it clear that the ***handle axis*** is the axis defined by or corresponding to the longest dimension of the elongate handle and is oriented generally perpendicular to the blade. Def. Ontel Ex. HH ('846 patent) (col. 2, ll. 29-33, 48-59; col. 3, ll. 40-42).

27. Support for this construction is also found in the prosecution history, where the inventors repeatedly describe the ***handle axis*** as one particular axis defined by or corresponding to the longest dimension of the elongate handle. Both the specification and prosecution history refer to Figures 1 and 2 of the patent and identify the ***handle axis*** as the axis labeled **X** in both figures. Def. Ontel Ex. HH ('846 patent); Def. Munchkin Ex. B (prosecution history of '846 patent) (Bates labeled Munchkin 305 (ll. 14-16); 306 (ll. 6-11, 13-14); 308 (ll. 8-12); 320 (figs. 1 & 2); 371; 392-96; 412-13 (¶ 8)).

28. At no point in either the specification or the prosecution history do the inventors ever mention or even suggest that the ***handle axis*** might refer to some axis other than the one corresponding to the longest dimension of the elongate handle. Def. Ontel Ex. HH ('846 patent); Def. Munchkin Ex. B (prosecution history of '846 patent).

29.     Further support for this construction is also found when it is compared to the construction suggested by FURminator.  Specifically, adopting FURminator's proposed construction of the term *handle axis* would mean that there are not one or even three but an infinite number of possible axes extending in all possible directions from the elongate handle.  This construction leads to absurd results because if the *handle axis* extends in any possible direction, then other clauses in the patent claims no longer carry any meaning, such as "*pulling the handle portion generally along the handle axis*" and "extending away from the blade edge segments generally in a direction perpendicular to the handle axis."  Def. Ontel Ex. HH ('846 patent) (col. 4, ll. 3, 49-51; col. 6, ll. 11-13).

30.     Constructions that result in words of the claims being rendered meaningless or superfluous are almost certainly incorrect.  *TechSearch, L.L.C.*, 286 F.3d at 1373; *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) (citing *Perkin-Elmer*, 822 F.2d at 1533 n.8); *Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 716-17 (Fed. Cir. 1998) (citing *Markman*, 52 F.3d at 981); *Vitronics Corp.*, 90 F.3d at 1584.

31.     Although FURminator has adopted the terms "lateral axis," "longitudinal axis" and "transverse axis" to support its proposed claim construction in this litigation, there is no mention of any of these three axes anywhere in the claims, specification or prosecution history of the patent. Def. Ontel Ex. HH ('846 patent); Def. Munchkin Ex. B (prosecution history of '846 patent).

32.     Finally, FURminator has argued that the indefinite article "a" in the phrase "a handle axis" means that the term *handle axis* can refer to one or many different possible axes.  The Court rejects this argument.  As described earlier, indefinite and definite articles are used in patent claim drafting in order to define precisely when the second or third or tenth reference to a

particular thing (as in "the handle axis") is the same thing that is being referred to in the first use of that noun ("a handle axis").  This is a basic rule of patent claim drafting over which there is no debate or issue.  Manual of Patent Examining Procedure, § 2173.05(e); *MercExchange, LLC*, 401 F.3d at 1338; *North Am. Vaccine*, 7 F.3d at 1575-76 (citing Faber, *supra* at 351).

   33.  FURminator has also argued that the term "a" in patent claim can also indicate "one or several in number."  The Federal Circuit has found, however, that this construction of the article "a" is only permitted when there is some basis in the patent specification for concluding that "a" can mean "one or several in number."  Conversely, when the patent specification describes a thing as being one in number, then the article "a" cannot mean "several."  *See* Manual of Patent Examining Procedure, § 2173.05(e); *MercExchange, LLC*, 401 F.3d at 1338; *North Am. Vaccine*, 7 F.3d at 1575-76 (citing Faber, *supra* at 351); *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) (applicant may disclaim plural interpretation); *AbTox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1024 (Fed. Cir. 1997) (limiting claim term "a metallic gas-confining chamber" to relevant devices with a single chamber because claim's repeated reference to "said chamber," instead of "a chamber," as well as statements made in the written description reinforced the singular nature of the chamber"); *Insituform Techs., Inc. v. Cat Contracting, Inc.*, 99 F.3d 1098, 1105 (Fed. Cir. 1996) (holding that repeated references in claim to both "a cup" and "the cup" and disclosure of only one cup in drawings and specification indicated that only one cup was involved); *Baldwin Graphic Sys.*, 2005 U.S. Dist. LEXIS 15527, at *10-15 ("As the *Abtox* court found, use of the word 'said' evidences an intention that the modified term be singular. . . .  The Federal Circuit regularly turns to the specification for context when weighing whether the patentee evinced an intent to limit the meaning of the article "a" . . . .  As with the patent specifications in

*Abtox* and *Insituform*, the reissue patent specification repeatedly modifies the relevant claim term, in this case fabric roll, with 'the.' Furthermore, Figures 1, 2 and 3 of the reissue patent all depict a single roll, just as the figure in *Abtox* depicted a single chamber and the figures in Insituform depicted a single vacuum cup . . . .").

34.     Accordingly, the Court finds that the construction of the term **handle axis** offered by Ontel and Munchkin—that is, "the axis defined by the longest dimension of the elongate handle"—is the correct one.

35.     The correct construction of the term **handle axis** leads to a finding of non-infringement in favor of Munchkin and Ontel, as described in greater detail below.

36.     Finally, FURminator has also argued that, as a matter of claim construction, the words "*as quickly and as effectively as the toothed blades disclosed in the '846 patent*" must be added to the clause "*to cause the blade edge to engage the loose hair of the pet and pull it from the pet without cutting or pulling the non-loose hair from the pet.*" There is no basis for adding this language to the patent claims. First, the "as quickly and as effectively as a prior art toothed blade" limitation does not appear anywhere in the patent claim itself—which means that adding this limitation in the course of claim construction would be undoubtedly incorrect as a matter of well-established law. The "as quickly and as effectively" limitation also does not appear anywhere in the specification or prosecution history of the patent. Adding the proposed language is incorrect as a matter of patent law and must be rejected. Def. Ontel Ex. HH ('846 patent); *Phillips*, 415 F.3d at 1312 (holding it would be unjust and an evasion of the law to construe claims in a manner different from the plain import of its terms; "It is a 'bedrock principle' of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude"); *Hoganas*

*AB v. Dresser Indus., Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993) (rejecting district court's incorporation of a size limitation into the claim term "straw shaped" and holding it is improper to add extraneous limitations to a claim); *Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) ("courts can neither broaden nor narrow claims to give the patentee something different than what he has set forth") (citation omitted).

### **"pulling the handle portion generally along the handle axis"**

37. The third step of claim 1 requires "pulling the handle portion generally along the handle axis." Def. Munchkin Ex. A, Porter Patent, Col. 4, l. 3.

38. "Pulling" is a common, non-technical term that means "apply[ing] force to so as to cause or tend to cause motion toward the source of the force." Def. Munchkin Ex. MMM, *American Heritage Dictionary* 1002 (2d Coll. ed. 1991). This definition is consistent with the description of "pulling" in the Porter Patent's Summary of the Invention and Description of the Preferred Embodiment. Def. Munchkin Ex. A, Porter Patent, Col. 1, ll. 50-55; *id.*, Col. 2, ll. 48-54. Both of these sections describe a user exerting force on the handle portion of the grooming tool to cause movement of the tool. In contrast, FURminator's proposed construction of "pulling" as meaning "the action of moving a comb or brush through hair" is not consistent with the ordinary and customary meaning of this term in the context of the Porter Patent, is not found in the patent, and is not referenced in the prosecution history.

39. With respect to the meaning of the phrase "the handle axis," the Porter Patent and prosecution history again make clear that the handle axis being described is the long axis of the elongate handle. *See id.*, Col. 3, ll. 34-49; Def. Munchkin Ex. B, Porter Patent File History, at 447 ("If a user makes or otherwise acquires a grooming tool as described in Applicants' specification at

pages 5-7 and uses the tool in the manner described on page 7, line 4-16 [Col. 3, ll. 34-49], loose hair will be removed from the furry pet without removing non-loose hair."). The referenced portion of the specification expressly discloses pulling the handle portion 22 of the grooming tool along the handle axis X. *See* Def. Munchkin Ex. A, Porter Patent, Col. 3, ll. 34-49; Def. Munchkin Ex. B, Porter Patent File History at 308.

40.     FURminator's argument that "the handle axis" can be any one of an infinite number of axes that might be drawn from a handle of the grooming tool lacks merit, as previously discussed. Use of the definite article "the" with the term "handle axis" clearly refers back to the handle axis previously described (the elongate handle axis), not some new handle axis not previously disclosed or discussed. *See Insituform*, 99 F.3d at 1104-06 (construing "a cup" and "the cup" as singular because the claims, specification, and file history all supported that construction). Indeed, it is inconsistent with the arguments made to the Patent Office during the Porter Patent's prosecution for FURminator to argue that "the handle axis" referenced in this third step of the claim is anything other than the long axis X depicted in Figure 1. *See* Def. Munchkin Ex. B, Porter Patent File History at 447; *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995) ("A patentee may not proffer an interpretation for the purposes of litigation that would alter the indisputable public record consisting of the claims, the specification and the prosecution history, and treat the claims as a 'nose of wax.'").

41.     Contrary to FURminator's arguments, this construction does not contravene the claim differentiation doctrine. Claim differentiation is an aid to construction, is not a hard and fast rule, and applies *only* when a proposed construction would make "a claim *superfluous*." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (emphasis added).

Dependent claim 4 adds to claims 1 and 3 a limitation "wherein the blade portion is mounted on the handle portion in a manner so that the blade portion trails the handle portion as the handle portion is pulled generally along the handle axis while the pet engageable portion is in engagement with the pet." Def. Munchkin Ex. A, Porter Patent, Col. 4, ll. 14-18. Construing claim 1 to require that "a handle axis" or "the handle axis" is the longitudinal axis X of the handle does not render claim 4 superfluous, because claim 4 further requires the blade portion to trail the handle portion. Claim 1 says nothing about the longitudinal placement of the blade on the handle -- the blade could be at the front end (and thereby trail the handle when the handle is pulled along the long axis), in the middle, or on the back end (and thereby "lead" the handle during the pulling step).

42. Accordingly, this Court construes the disputed phrase "pulling the handle portion generally along the handle axis" as "applying force to the handle portion so as to cause or tend to cause motion toward the source of the force generally in the direction of the long axis of the handle."

43. Because it is not necessary to resolve for purposes of this preliminary injunction motion, the Court declines at this time to determine whether the third step of claim 1 of the Porter Patent is a step-plus-function claim pursuant to 35 U.S.C. § 112, ¶ 6, as asserted by Munchkin. *See Wireless Agents, L.L.C. v. Sony Ericsson Mobile Communications AB*, 390 F. Supp. 2d 532, 538 n.7 (N.D. Tex. 2005) (declining to construe multiple patent claim terms where the court only needed to construe one term to conclude that the plaintiff was not entitled to preliminary injunctive relief)."

44.     FURminator has proposed other terms to be construed as part of this motion. However, because the Court's construction of the terms above is all that is needed to conclude that there is no likelihood of FURminator's success on the merits, the Court need not reach the construction of other claim terms requested by FURminator at this stage in the litigation.

### *Alleged Infringement of the Porter Patent*

45.     After determining the scope and meaning of the patent claim, the Court must compared the construed claim against the allegedly infringing product. *See Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004).

46.     For there to be literal infringement, each and every feature of the patent's claim must be present. *Id.* at 1369.

47.     Each asserted claim of the Porter Patent, whether independent or dependent, requires use of a grooming tool having an elongate handle portion and pulling the grooming tool in the direction of the long handle axis, *i.e.*, the axis along which the elongate handle stretches out to its fullest length. *See* Def. Munchkin Ex. A, Porter Patent, Col. 3, l. 59 - Col. 6, l. 23.

48.     Because Munchkin's grooming tool does not have an elongate handle, this Court concludes that FURminator has failed to establish that Munchkin's grooming tools infringe any claim of the Porter Patent. Therefore, FURminator has not demonstrated that it will likely prove infringement of any claim of the Porter Patent at trial.

49.     The Court specifically notes and rejects FURminator's arguments that Munchkin copied the FURminator commercial product and therefore directly infringed. In fact, the evidence shows the opposite. Munchkin was aware of the Porter Patent and specifically designed its grooming tool to avoid the Porter Patent by eliminating a handle from a prototype of the tool,

thereby ensuring non-infringement of all claims of the Porter Patent. *See* Hatherill Dep. at 120:17 - 121:8.

50. Because the Munchkin grooming tool is *not* operated by pulling it in the direction of the long axis of anything that could be described as an elongate handle, the Court concludes that FURminator has failed to establish that Munchkin's grooming tools infringe any claim of the Porter Patent. Therefore, FURminator has not demonstrated that it will likely prove infringement by Munchkin of any claim of the Porter Patent at trial.

51. There is no dispute that the Shed Ender is used by pulling the tool through a pet's coat in a direction that is generally <u>perpendicular</u> to the longest dimension of the handle, like a hairbrush. This method of use is described in the product's instructions and is shown in Ontel's infomercial. The tool literally does not function when pulled through a pet's fur in a direction that is generally parallel to the longest dimension of the handle because then the fine-toothed metal comb portion of the tool cannot engage and pull out loose hair from the pet's fur. *See* Def. Ontel Ex. A, ¶¶ 20 (Murphy Decl.); Def. Ontel Ex. G, ¶¶ 22-25 (Anderson Decl.); Def. Ontel Ex. P (Ontel infomercial); Def. Ontel Ex. VV (Shed Ender instructions).

52. As such, the use of the Shed Ender tool is missing one of the elements of claim 1 of the '846 patent—specifically, "pulling the handle portion generally along the handle axis." Def. Ontel Ex. HH ('846 patent) (col. 4, line 3).

53. An accused method that is missing even one of the elements of the patented method does not literally infringe that patent as a matter of law. *MicroStrategy, Inc. v. Business Objects, S.A.*, 429 F.3d 1344, 1352 (Fed. Cir. 2005) ("If . . . even one claim limitation is missing or not met, there is no literal infringement.") (citing *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206,

1211 (Fed. Cir. 1998)); *Amazon.com*, 239 F.3d at 1351 (citing *Bayer AG v. Elan Pharm.
Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000) ("Literal infringement requires the patentee
to prove that the accused device contains each limitation of the asserted claim(s).")

54.     As the use of the Shed Ender tool is missing one of the required elements of claim
1, the use of this tool does not literally infringe claim 1 of the '846 patent or, for that matter, any
other claim that includes this element. *MicroStrategy*, 429 F.3d at 1352; *Mas-Hamilton Group*,
156 F.3d at 1211; *Amazon.com*, 239 F.3d at 1351; *Bayer*, 212 F.3d at 1247.  Therefore,
FURminator has not demonstrated that it will likely prove infringement by Ontel of any claim of
the Porter Patent at trial.

55.     FURminator has not argued anywhere in its motion papers or otherwise that Ontel
is somehow liable for infringement through doctrine of equivalents.  Therefore, there is no need for
the Court to consider the question of infringement by doctrine of equivalents at this point.

56.     Because it is not necessary to resolve for purposes of this preliminary injunction
motion, the Court declines at this time to address the defendants' arguments concerning the alleged
invalidity or unenforceability of the Porter Patent.

### The Court's Analysis of the Preliminary Injunction Factors

57.     FURminator has not demonstrated that it will likely prove infringement of any claim
of the Porter Patent at trial.  Munchkin and Ontel have established a clear case of non-infringement
of the Porter Patent.

58.     Further, given the lack of a strong showing on patent infringement, irreparable harm
is not presumed and FURminator has failed to demonstrate that money damages are an inadequate
remedy at law.  *See* Def. Munchkin Ex. E, Hatherill Decl., ¶ 18.

59.     Accordingly, FURminator is not entitled to a preliminary injunction on its patent claim, and the Court need not consider the remaining factors. *See Amazon.com*, 239 F.3d at 1350.

60.     Nonetheless, the remaining factors, the public interest and the balance of the hardships, favor denying the injunction. The public interest in free and fair competition outweighs FURminator's private financial interests. The balance of the hardships supports denying the motion because Munchkin has taken care to avoid FURminator's patent and would be harmed if not allowed to sell its grooming products in the market. *See* Def. Munchkin Ex. E, Hatherill Decl., ¶¶ 12-15 (including referenced exhibits); Hatherill Dep. at 120:17 - 121:8. Ontel would also be harmed in its reputation and customer relationships if not allowed to sell its grooming product in the market. *See* Def. Ontel Ex. K, ¶¶ 32-40 (Khubani Decl.).

## B.     FURminator's Trademark Infringement Claim

### *Preliminary Injunction Standards*

61.     In connection with the trademark infringement claim the Court will follow and apply the legal authority and decisions of the Eighth Circuit. *See Nautilus Group, Inc. v. Icon Health & Fitness, Inc.*, 372 F.3d 1330, 1334 (Fed. Cir. 2004) (law of regional circuit is applied in trademark cases).

62.     "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

63.     "A district court has broad discretion when ruling on preliminary injunction requests." *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 782 (8th Cir. 2004).

64.     In determining whether to grant a preliminary injunction, a court considers: (1) the probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of an injunction is in the public interest. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 112-14 (8th Cir. 1981) (en banc).

65.     When applying the *Dataphase* factors, "a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998).

66.     A court cannot grant a preliminary injunction unless a plaintiff establishes both a reasonable likelihood of success on the merits and the threat of irreparable harm. *See Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 603 (8th Cir. 1999); *see also Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 738 (8th Cir. 1989) (en banc).

**Trademark Standards**

67.     In order to succeed on a claim of trademark infringement, a plaintiff must prove that it owns a valid and distinctive trademark that is entitled to protection, and that the relevant consumers are likely to be confused by another's use of a similar trademark. *See Hubbard*, 182 F.3d at 601.

68.     If the mark at issue is not federally registered, the plaintiff bears the burden of establishing that its marks are protectible under trademark law. *See Frosty Treats, Inc. v. Sony Computer Entertainment Am., Inc.*, 426 F.3d 1001, 1003 (8th Cir. 2005). Additionally, where the mark is not registered, "there is no presumption of validity and the Plaintiff has the burden of

proving that its mark is not generic." *Burger King Corp. v. Pilgrim's Pride Corp.*, 705 F. Supp. 1522, 1525 (S.D. Fla. 1988).

69.     To determine whether the mark is protectible, the court must first categorize it as (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful. *See Frosty Treats*, 426 F.3d at 1004.

70.     A generic mark "refers to the common name or nature of an article, and is therefore not entitled to trademark protection." *Id.* at 1005. Generic terms are not entitled to protection under trademark law because "such words are in the public domain and available for all to use." *Cellular Sales, Inc. v. Mackay*, 942 F.2d 483, 485 (8th Cir. 1991); *see Insty*Bit, Inc. v. Poly-Tech Indus., Inc.*, 95 F.3d 663, 673 (8th Cir. 1996).

71.     A term is descriptive if it conveys an "immediate idea of the ingredients, qualities or characteristics of the goods," and is protectible only if shown to have acquired a secondary meaning. *Frosty Treats*, 426 F.3d at 1005 (quoting *Stuart Hall Co., Inc. v. Ampad Corp.*, 51 F.3d 780, 785-86 (8th Cir. 1995)). The entity claiming trademark protection for a descriptive term bears the burden of proving the existence of secondary meaning. *Id.*

72.     "Secondary meaning is an association formed in the minds of consumers between the mark and the source or origin of the product." *Id.* (quoting *Co-Rect Prods., Inc. v. Marvy! Adver. Photography, Inc.*, 780 F.2d 1324, 1329 (8th Cir. 1985)). Secondary meaning requires that "the public recognize the mark and associate it with a single source." *Id.* A trademark user establishes secondary meaning by showing that through "long and exclusive use in the sale of the user's goods, the mark has become so associated in the public mind with such goods that the mark

serves to identify the source of the goods and to distinguish them from those of others." *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 870 (8th Cir. 1994).

73. "[D]irect evidence such as consumer testimony or surveys are most probative of secondary meaning." *Frosty Treats*, 426 F.3d at 1005. "Circumstantial evidence such as the exclusivity, length and manner of use of the mark; the amount and manner of advertising; the amount of sales and number of customers; the plaintiff's established place in the market; and the existence of intentional copying could also establish secondary meaning." *Id.* at 1005-06. Notably, while "advertising is a relevant factor in determining whether a mark has acquired a secondary meaning, it is the effect of such advertising that is important, not its extent." *Co-Rect Prods.*, 780 F.2d at 1332; *see also Wrist-Rocket Mfg. Co. v. Saunders Archery Co.*, 578 F.2d 727, 532 (8th Cir. 1978) (stating that "common-law trademark rights cannot be established by advertising alone").

74. The ultimate inquiry on secondary meaning is whether, in the consumer's mind, the mark denotes a single thing coming from a single source: it is the perception of the term by the consumer that matters. *See Co-Rect Prods.*, 780 F.2d at 1332-33. Without such a showing of secondary meaning for a descriptive term, there can be no likelihood of confusion, and no trademark infringement. *See id.* at 1333.

### Categorization of "DESHEDDING"

75. "Deshedding" is the common generic name for removing the loose undercoat of pets. *See* Def. Munchkin Ex. OOO, at 3; Def. Munchkin Ex. C, Bryant Decl., ¶ 9; Def. Munchkin Ex. E, Hatherill Decl., ¶ 9; Def. Ontel Ex. A, ¶¶ 20-23 (Murphy Decl.); Def. Ontel Ex. G, ¶¶ 13, 19, 22-25 (Anderson Decl.); Def. Munchkin Ex. DD, V, W, X, Y, & Z; Hearing Tr. at 119:14-25.

76. Thus, "deshedding" appears to be generic as applied to the goods in question and is incapable of functioning as a source-identifier for FURminator's goods. *See Frosty Treats*, 426 F.3d at 1004-05; *Cellular Sales*, 942 F.2d at 485; Def. Munchkin Ex. OOO at 3.

77. Assuming <u>arguendo</u> that the term is not generic, "deshedding" is at best descriptive, in that it conveys an "immediate idea of the ingredients, qualities or characteristics of the goods." *Frosty Treats*, 426 F.3d at 1005 (holding that the term FROSTY TREATS is descriptive, if not generic, for frozen desserts, and not entitled to trademark protection); Def. Munchkin Ex. OOO at 3; Def. Munchkin Ex. C, Bryant Decl., ¶ 9; Def. Munchkin Ex. E, Hatherill Decl., ¶ 9; Def. Munchkin Ex. DD, V, W, X, Y, & Z; Hearing Tr. at 119:14-25.

78. On the basis of the printed articles and extensive use by third parties in the grooming industry, it is apparent that both consumers and groomers use the word "deshedding" to refer to the process of removing the shedding hair from a furry pet and the words "deshedding tool" to refer to a tool designed and used for carrying out this process. The Court also takes judicial notice of the dictionary definitions for the terms "de-" (meaning remove or remove from) and "shed" (meaning something that is shedded). *Steak N Shake Co. v. Burger King Corp.*, 323 F.Supp.2d 983, 994 (E.D. Mo. 2004); Def. Ontel Ex. A, ¶¶ 20, 23 (Murphy Decl.); Def. Ontel Ex. G, ¶¶ 13, 19, 22-25 (Anderson Decl.); Def. Ontel Ex. LLL ("Notes from the Grooming Table: An All-Breed Grooming Guide for the Professional Pet Stylist," pp. 5, 7, 9, listing "de-shedding tool" among tools needed to groom particular breeds of dog); Def. Munchkin Ex. H (dictionary definitions); The American Heritage College Dictionary (3d ed. 2000) at 1254.

*Alleged Secondary Meaning for "DESHEDDING"*

79.     FURminator has produced no direct evidence of secondary meaning, in the form of either consumer testimony or consumer surveys demonstrating that the term "DESHEDDING" has become so associated in the public mind with FURminator's products that it serves to identify and distinguish them from the products of others.  If anything, the common usage of the term in connection with others' deshedding products and services strongly suggests that the term is not readily identified as connected to FURminator.  *See* Def. Munchkin Ex. OOO (and exhibits attached thereto); Def. Munchkin Ex. C, Bryant Decl., ¶ 9; Def. Munchkin Ex. E, Hatherill Decl., ¶ 9; Def. Munchkin Ex. DD, V, W, X, Y, & Z; Hearing Tr. at 119:14-25.

80.     This same evidence establishes that FURminator's usage of "DESHEDDING" has not been exclusive.  *See id.*

81.     FURminator's relatively short usage of "DESHEDDING" does not support its claim of secondary meaning.  There simply has not been enough time to develop consumer recognition of the word "deshedding" as a trademark rather than as a descriptor for the product. *See, e.g.*, *Co-Rect Products*, 780 F.2d at 1322 (ten months of use is not enough to establish secondary meaning); *Cornucopia, Inc. v. Wagman*, 710 S.W.2d 882, 888 (Mo. Ct. App. 1986) (two years is an insufficient amount of time for the word "cornucopia" to acquire secondary meaning).

82.     FURminator's sales and advertising expenditures are insufficient to establish secondary meaning.  Its sales for 2004 were only approximately [$ redacted].  *See* Def. Munchkin Ex. U.  Although sales subsequently increased significantly in 2005, the brief period of time of such

sales is insufficient to support a claim that secondary meaning has been established. *See Co-Rect Products*, 780 F.2d at 1322; *Cornucopia*, 710 S.W.2d at 888.

83.     FURminator's marketing expenditures for 2004 were under [$ redacted], only a fraction of which was for advertising to the general consumer. Def. Munchkin Ex. U;  D. Porter Dep. at 44:24 - 45:12, 46:22 - 48:20. The amount spent on advertising in 2005 was over [$ redacted], but this includes the cost of producing an infomercial. *See* Def. Munchkin Ex. U at FURminator 1544;  D. Porter Dep. at 49:7 - 51:18. These expenditures do not support a claim of secondary meaning.

84.     FURminator has produced no evidence sufficient to demonstrate that Munchkin or Ontel intentionally copied either FURminator's product or product name in an attempt to confuse consumers. Moreover, FURminator has admitted there have been no reported instances of actual confusion between FURminator's and Munchkin's and Ontel's products, all of which look substantially different in shape, color, product packaging, and the use of the companies' respective logos, thereby rendering consumer confusion unlikely. *See Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1055 n.4 (8th Cir. 2005); *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 627 (8th Cir. 1987). While the defendants certainly knew of FURminator's product and planned their own products to compete against it, this is evidence of competition, not bad-faith "passing off."

85.     There is a significant cost difference between the FURminator and the Munchkin and Ontel products, and a customer decision based on price is not a harm cognizable under the Langham Act. *See Cellular Sales*, 942 F.2d at 487; *General Mills*, 824 F.2d at 627.

***The Court's Analysis of the Preliminary Injunction Factors***

86.     FURminator has not demonstrated that it has a valid and protectible trademark in the term "DESHEDDING" and therefore has not proved a reasonable likelihood of success on the merits on its trademark infringement claim.

87.     Even assuming that "DESHEDDING" is a descriptive trademark, FURminator has failed to provide sufficient evidence demonstrating that it acquired secondary meaning in the mark and therefore has not proved a reasonable likelihood of success on the merits on its trademark infringement claim.

88.     FURminator has not proved there is any threat of irreparable harm, such that money damages are an inadequate remedy at law. *See* Def. Munchkin Ex. E, Hatherill Decl., ¶ 18; Def. Ontel Ex. U (2004-06 total FURminator tool sales).

89.     Finally, the remaining factors, the public interest and the balance of the hardships, both favor denying the injunction. The public interest is not served by allowing FURminator to appropriate for its exclusive commercial use words which retain generic or primary meaning. *See General Mills*, 824 F.2d at 628. There is a very strong public interest in favor of legitimate competition among goods in the marketplace. *Calvin Klein Cosmetics Corp. v. Lennox Labs., Inc.*, 815 F.2d 500, 505 (8th Cir. 1987). The balance of the hardships supports denying the motion because Munchkin has taken care to avoid FURminator's intellectual property rights and would be harmed if not allowed to sell its grooming products in the market. Ontel similarly would be significantly harmed in its reputation and customer relationships if not allowed to sell its grooming products in the market.

**Conclusion**.

For the foregoing reasons, the Court concludes that plaintiff FURminator's motion for preliminary injunction should be denied on its claims for patent and trademark infringement, as plaintiff has not shown a likelihood of success on the merits or irreparable harm, and the balance of the hardships and the public interest weigh against the issuance of an injunction.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff FURminator's motion for preliminary injunction is **DENIED**.  [Doc. 19]

**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this   17th   day of March, 2006.